## ALEJANDRO CALDERON v. THE STATE.

### No. 1101. Decided November 22, 1911.

**1.—Murder—Argument of Counsel—Bill of Exceptions.**

　　Where, upon appeal from a conviction of murder, there was no bill of exceptions to the argument of counsel, and besides, it appeared from the record that the objectionable language was not used by State's counsel, there was no error.

**2.—Same—Sufficiency of the Evidence—Express Malice—Death Penalty.**

　　Where, upon trial of murder, the evidence clearly justified the jury in finding that the killing was with express malice, for which they assessed the death penalty, there was no error. See opinion for facts showing express malice. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Bexar. Tried below before the Hon. Edward Dwyer.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—The appellant was indicted, tried and convicted for the murder of D. Morales, by cutting him with a knife and the death penalty was assessed.

There is no complaint whatever of the charge of the court, no bill of exceptions, and no special charges asked or refused.

There are but two questions raised by the motion for new trial. One of these is complaining of the opening argument by the district attorney to the jury, wherein it is claimed he denounced the defendant as "a red handed assassin and murderer," which language, it is claimed by this motion, was calculated to and did prejudice the jury and inflame their minds against the defendant, and was instrumental in and did cause it to assess the death penalty as will appear by defendant's bill of exception No. 1. There is no bill of exception No. 1, or other bill in the record. We find, however, in the record, a contest of this ground of the appellant's motion by the district attorney, wherein he says that said ground of the motion is untrue, and the affidavit made by him is further as follows: "The district attorney, at no time in his argument to the jury, nor at any other time, referred to the defendant as a red-handed murder and assassin.

"In appealing to the jury to assess the death penalty in this case, during his argument, he reminded the jury that laws were enacted and enforced for the benefit and protection of society and that the people looked to them for the safeguarding of the best interests of society; that the safety of human life was vouchsafed only by prompt inflic-

tion of severe punishment, at the hands of juries, upon those guilty of crime. He reminded them that infliction of the death penalty, the forfeiting of a fellow being's life, was a severe and serious matter; that the object of the law prescribing the death penalty as a punishment for murder, assassination, rape, and all capital offenses, was not the punishment itself, nor revenge, but rather as an example calculated to forcibly impress others with the sacredness of human life and the grave results to those who wrongfully take it."

This matter was not authenticated by a bill of exceptions and we have stated it fully, as the death penalty was assessed in this case, so as to show that no error was committed by the court below in refusing to grant a new trial on this ground.

The other grounds of the motion for new trial are as follows:

"1st. Because the verdict of the jury is contrary to the law.

"2d. Because the verdict of the jury is not supported by the evidence in this, to wit: 1st: The State failed to prove express malice—the facts proven, showing conclusively that the deceased and defendant were good friends up to and immediately prior to the homicide. 2d: And the facts show that defendant was very drunk at the very time of the homicide and was therefore incapable of cool reflection, and 3d: Because the proof shows positively that defendant was too drunk at the time of the killing to distinguish the difference between right and wrong and did not know what he was doing at the time of the killing." This presents the material question in this case.

Each of the judges of this court have time and again gone over and considered this whole record and have had repeated discussions and consultations thereabout.

There were but few witnesses who testified. There were but three besides the appellant, of the eyewitnesses who testified. In addition to them, only the undertakers and the officer, who was called to the scene of the murder very soon after it occurred, testified.

Paul Reibe, one of the undertakers, testified on direct examination, as follows: "My name is Paul Reibe. I live in San Antonio, and am in the undertaking business. I remember the occurrence of the killing of a man named D. Morales, in this county and State on or about the 10th day of July, 1910. The police department phoned me to get the remains of a man who had been murdered. I went there in the early hours on Sunday morning and got his remains from a little hut across from the San Fernando Cemetery. I have a brother named Will. He did not visit the place; he prepared body after it came to the room, I went and got it. The remains was lying on the bed, and he had evidently been stabbed, and cut. I did not make an examination, but I saw some of the cuts. I paid no attention; I left it entirely to my brother, he prepared the body. I saw there was evidently a struggle, and there was blood everywhere on the bed and on the walls. I placed the remains in the basket and took them to the establishment. He was dead. This occurred in this county and

State. It was so dark there it would be difficult to have made any kind of an examination. In preparing the body, we removed the clothes. My brother prepared the body; I was about the place, but I paid no attention. The remains were those of D. Morales." Cross examination: "This happened on Saturday night, and our records show it was on July 10th. It was early in the morning, somewhere around three or four o'clock, Sunday morning. I got the call about that time, and as soon as I got the call I went out and got him. I went out immediately and got the body."

Will Reibe, the other undertaker, testified on direct examination, as follows: "My name is Will Reibe. I remember the occurrence of the killing of D. Morales in this city on July 10th, 1910. When my brother brought the remains to the establishment, I examined the wounds and dressed him there, and prepared him for burial. I found two knife wounds over the right ear about three-fourths of an inch long; I found another one across the top of the head running in this direction (indicating), about an inch long, right across the top of the head. I found another one about three inches on the right side of the spinal column, right under the shoulder blade, three inches long. It was just a deep flesh wound, it didn't penetrate the cavity. He had another one which was on the line three inches back from the right nipple, three inches down, between the fifth and seventh rib. The sixth rib was completely severed in half. (Indicating to the jury.) Three inches this way (indicating), and three inches down, between, between the fifth and seventh rib, cutting the seventh rib in half and penetrating the cavity, and penetrated the cavity, and penetrated the liver, and he cut a piece off of the liver, which made an internal hemorrhage. Those were the only wounds that he had. These remains were those of a man named D. Morales.

"I have had several years' experience in dressing wounded men, as an undertaker. I have dressed quite a few in that way. I think it was the internal hemorrhage that caused the death of D. Morales, caused by the stab wound, the liver being cut, caused the internal hemorrhage. The abdominal cavity was filled with blood. There was lots of blood clots on the inside; there was space for it to accumulate.

"This wound in the right side went into the cavity; it went clean through, severed one rib right in half, and went into the cavity; when it severed the rib, went into the liver and severed the liver. I didn't examine closely how many inches it cut into the liver; don't know exactly how close it was, but it took off quite a piece. The wounds on the top of the head were just only scalp wounds, and didn't penetrate the skull at all." Cross-examination: "I was not at the establishment when the remains were brought there; when I came down the next morning the remains was there."

Mrs. Reye Morales, through an interpreter, both the witness and interpreter being duly sworn, testified on direct examination, as fol-

lows: "My name is Mrs. Reyes Morales. I live on South Colorado Street near San Fernando Cemetery. I have lived here a number of years; I was here long before the railroad came. I have a son in Mexico, and the one that was killed, Doreteo Morales. He was killed four or five months ago in my house on South Colorado Street, opposite the San Fernando Cemetery. Alejandro Calderon. Alejandro is right there (referring to defendant). When Alejandro Calderon killed D. Morales, Vidal Agular, my grandson, and a nephew of this man, Monico Calderon, and myself were there present. He was killed in my house, over my body, and I caught the man. Alejandro Calderon came to my house and asked Doreteo Morales to take a walk on the street. Doreteo was in my house. Alejandro asked him to take a walk on the street, to look around. He said he didn't want to go. Then Alejandro went off and came back again and asked him to go again, and he told him he wouldn't go, then he came back the third time. Then he says, 'Why don't you want to go on out of the house?' He said that he didn't go on the street when he didn't have any business there. Then he asked his nephew, Monico Calderon, to go, and his nephew said he was going to a dance. Alejandro then asked his nephew, Monico Calderon, to go out with him, and he said no, he was going to a dance. Every time Alejandro came, he came into the house, and every time my son, D. Morales, told him he didn't want to go. All this time, my son, D. Morales, was in the house, sitting down. This was early in the night. The last time he came must have been about eight o'clock. Now, after Calderon came back the third time and asked my son, D. Morales, to go walking with him, and Morales refused, then he went off and came back again and Menico Calderon, his nephew, came back with him. This was the third time that he came back. Monico Calderon is his nephew. Monico Calderon was working on the section. As long as he wasn't working he had a little room in the back part of my lot; this man here, Alejandro Calderon, and Monico Calderon, his nephew, were living together. This defendant lived on the back part of my lot. All the time this was going on in my house, I was sitting inside of my house. When he came back the third time he got his dagger knife. The back door was closed and the front door was open, this man (the defendant) broke down the fence and came into the house and put out the light. Monico Calderon hollered for us to close the door; the back door was closed and the front door was open, and this man, the defendant, broke down the fence and came into the house and put out the light. Monico Calderon hollered because he saw this man, the defendant, coming with a dagger; they were together in the house. Monico Calderon hollered for us to close the door, that he, Alejandro Calderon, was coming, but he didn't say anything about the dagger. Me, my son, and Vidal Agular, were in the house. He, Alejandro Calderon, didn't say anything until after he had cut my son in the top of the head. One door of the house opened towards the street, and the little high

fence was between, cutting off the house from the little garden, a little flower garden, from the street. He could not get into the house that way without breaking down that fence, and he broke down the fence. Monico Calderon didn't do anything, except he hollered for us to close the door, that he, defendant, was coming, but he didn't say anything about the dagger, and he, Monico Calderon, didn't come into the house until afterwards. This man couldn't get into the back door, so he came in the front door, broke down the fence, and came into the front door. After he cut my son in the head, then he cursed him. He didn't speak until after he came into the house and blew out the light. He knocked the lamp chimney off of the lamp and broke it, and put out the light. The first thing he did when he came in the house he knocked the chimney off the lamp and put the lamp out and then he cut my son. I didn't see anything in his hand when he came into the house, because it was dark. He cut my son on the head first, then me and my son caught this man here, the defendant, and we all fell together. My son fell over on me. I do not know how many times my son was cut, I was scared. He had one cut here (indicating) and one here (indicating the head and side). When this defendant came in and stabbed my son, I was talking to my son and wanted him to go to bed, and he did the cutting without saying a word. My son didn't have anything more than I have now in my hand. When he stabbed my son, my son fell on me and I grabbed this man, the defendant, and commenced hollering for the people, and Monico Calderon was standing up at that time. I held defendant and I called on Monico Calderon to help take the dagger away from this man, and he, Monico Calderon, said he wouldn't go near him. Then I held him until the officers came. I was so scared I don't know how long I held him. While I was holding him on the bed, he wanted to kill me. He held the dagger until the officers came, then Monico Calderon came and took the dagger and hid it in between the bed clothes. When I was holding him he would move his hands backward and forward and he still had the dagger in his hands all the time I had him by the arms. He tried to get away, but the Lord helped me and He wouldn't let him; the Lord gave me strength enough to hold him. During the scuffle, my son didn't speak at all, he just groaned, he never had time to speak, and this defendant was cursing my son all the time. I don't remember all he said, he called him a son-of-a-bitch, a chincado, and things, I don't remember all of them. My son never spoke during the scuffle. He groaned. He was in his agony after he was stabbed. He never spoke from the time he was cut until he died. While I was holding this man, the defendant, he was just abusing me and cursing. At that time my son was dead. The officers that came were the officers out on Guadalupe Street. When the officers came they put on the handcuffs, and the defendant said: 'He owed it and he paid it.' This happened in San Antonio, Bexar County, Texas. When the officers came, they took charge of the defendant, and Monico Calderon took the dagger

and hid it in between the bedclothes. The officers found the dagger; they saw where he put it—I didn't see that, I don't know whether they saw him or not; when the officers came, one of them took hold of the defendant on one side and the other one took hold of the other side, and Monico Calderon says to this man, the defendant, to give him the dagger and he put it in between the bedclothes. Then the policeman took it. I would recognize the dagger. It had a ridge around it. (Here witness identified the dagger as the one defendant had killed D. Morales with.) (Here witness left the witness stand and held a conversation with the district attorney, then returned again to the witness stand.) My son spoke just one word before he died. The last work he spoke before he died, he put his hands on the de·fendant and told him not to kill his mother. (The court: The witness said the deceased exclaimed, 'Infamous man, don't kill my mother.') The court, by this statement, corrected the interpretation of the witness' language as made by the interpreter. At that time I had him, holding him until the officers came. After the officers came I thought my son was still living and I told the officers to let me telephone for a doctor, and the officers told me a doctor wouldn't do any good, that he was dead."

Cross examination: "The last time the defendant came in the door about two or three o'clock—I don't know what time it was, it was in the morning. It was one or two or three o'clock in the morning. Neither myself, my son, D. Morales, nor Agular, my grandson, had gone to bed; it was early yet. My son came into the house the last time that evening about half past eight or nine o'clock, I don't know exactly. He came in with Monico Calderon. This was on Saturday night. My son came in and asked me for a quarter. I asked him what he wanted with it, and he said he wanted to get some beer. He went off with this man, the defendant. Monico Calderon came back with this man, brought him home. I asked him where my son was and he said, 'He is right there nearby.' Then I told him to go and get my son, and I asked him why he took my son away. Then he went and got my son and brought him home, and then went back to the room where this man, the defendant, was. My son had not been drinking. My son had been working on the Leona, but had not been working that day. He was there all day, and left the house for the first time that day when he went off with Alejandro, about eight, or eight-thirty or nine o'clock. My son never went out at night, he just went to his work and came home. I don't know how old my son is, but he is twenty-four or twenty-eight, more or less, I don't know how old he is. I had often seen Alejandro Calderon drink, and that day, just at that time, he had drunk three or four beers, I guess, in order to do what he did. My son and Alejandro had not been drinking that night, and they had not been out at the saloon. My son never had been out with him.

"We had only known this man, Alejandro Calderon, a short while.

My son had been gone to Lorraine and had not been back but four or five months. The defendant had been living in my yard for ten or fifteen, maybe twenty days. When my son got the quarter from me, this man had come for my son, and asked him to go, three times. The nearest saloon to my house is at the corner of Colorado and El Paso Street. He came and invited my son to go out and he went out. They went out and had a friendly drink. I had seen the defendant drinking before, but this night he was not drinking, he was just putting on. He was not drunk. I don't know how often he drank, I was not with him. I have seen him at times before when he was drunk and he couldn't walk, but he was not in that condition this time, he was not drunk. He wasn't so drunk he was not able to walk. He could walk. When a person is drunk they stagger, and this man did not stagger. When I was holding the defendant he was hard to hold. It is not a fact that he was so drunk that he went to sleep when I was holding him. He was wider awake than I was. He fell on me and I held him. We were tussling with each other there and he was trying to cut me, and I held him. When he first came into the house he put out the lights and then cut my son. Naturally it was dark after the light was put out; it was dark inside of the room, but the light came through the window from the moon. The only light we had there was from the moon through the window. When this man came in I was trying to get my son to go to bed, but he wanted to go and listen to some music. He was on the edge of the bed when this man came in and put out the light. I didn't know what time it was until the officers came. I was holding this man more than a half hour before the officers came. They telephoned for the officers. The officers can testify I was the only one holding him when they came. My son and the defendant had not been out together that day. He had never been out with this man before. This man's sister, Felipa Calderon, defendant's sister, had known us for five or six years. He was not friendly with my son, because my son was not here. They had never had any previous trouble, never had any fussing before that time, and my son had been only a short time from Lorraine." Re-direct examination: "An undertaker came that night and took the remains of my son and put him in a basket and took him and prepared him for burial. I don't know what undertaker it was, I saw him in the hall here, today. This happened in San Antonio, Bexar County."

Vidal Agular testified on direct examination as follows: "My name is Vidal Agular. I live on South Colorado Street in front of the graveyard, with my father. Mrs. Reyes Morales is my grandmother. I knew D. Morales; he was my uncle. I was present the night D. Morales was killed. Alejandro Calderon killed him. Alejandro Calderon is here present, (referring to defendant). I didn't see anything except what happened there at my grandmother's. She was asking my uncle, D. Morales, to go to bed, and this man, the defendant, came in

and cut my uncle. I was holding my uncle, trying to get him to go to bed when this man, defendant, cut him. My uncle was inside of the house, and right by the side of the bed. He was not sitting on the bed. I was holding his hands, trying to get him to go to bed. My grandmother was arguing with him, trying to get him to go to bed, too, and then this man, defendant, came in and cut my uncle. I don't know how many times he cut him. I did not see him cut him. He just came running in and cut him, came running fast. I had my uncle, was holding him, and my grandmother was standing up, arguing with him, trying to get him to go to bed. This man, the defendant, came in and he put the light out, put the candle out, then he commenced to cut my uncle. My uncle fell on top of me and he was too heavy for me, so I got under the bed; then my grandmother caught this man, the defendant, then she hollered for me to go and get an officer. After D. Morales was cut, he didn't speak, except to say, 'Don't kill my mother.' He was falling when he said that. My uncle didn't have anything in his hand. This occurred in Bexar County, Texas. After my grandmother got hold of this defendant, I didn't see what she did with him, my grandmother had sent me out to get an officer. When I left to go for the officer this man was on the bed and my grandmother was there too, holding him. I don't know whether she was on top of him or on the side of him; I didn't see it. I went and got an officer and came back with the officer. When I came back with the officer, I don't know what position this man and my grandmother were in, because I didn't go inside. The officer went on the inside and I stayed on the outside. After that, when I saw my uncle, he was on the bed, dead. I was about twenty-five minutes in going after the officer. This man had a dagger in his hand when he rushed into the room and attacked my uncle. I did not see it at that time, but I saw it afterwards when the officers had it. (Here witness identified the dagger.) The officers brought the defendant to the station. I did not hear this man say anything when the officers got there. The undertaker came and got my uncle's body. I know Monico Calderon; I saw him there that night in the house when this man came in, but he didn't do anything. I don't know whether or not he was there when the officers came, I didn't go inside and I don't know. I do not know where Monico Calderon is now. This man (the defendant) is his uncle."

Cross examination: "There was a lamp that was burning on the table there. When the defendant came in, he put out the light. I don't know whether he had anything in his hand or not. This defendant lived in the same yard with my uncle and they were good friends. The defendant and my uncle and they were good friends. The defendant and my uncle had been out drinking together that night. My uncle had been drinking a little, and before this man came in, he wanted to go out again, and my grandmother was trying to put him to bed. He didn't say where he wanted to go, he just said he

wanted to go outside. He didn't say why he wanted to go out. I don't know what time it was, I didn't see the clock. I don't know whether the defendant was drunk or sober that night. I don't know whether he had been drinking or not. I did not see the defendant there but one time that night. I didn't know whether he was there more times or not. It was dark in the room there without the light; I couldn't see what anybody was doing. When my uncle fell on me I crawled under the bed." Redirect examination: "When the light was out it was perfectly dark in there; I do not know whether it was a moonlight night. The window and door were open. When I left the room, I could not see the position of this defendant and my grandmother. The light was not lighted when I got back. When the light went out it was plenty dark. I found my way to the door. It wasn't so dark but what I knew where the door was. There wasn't any light coming in the door or window."

Here the State offered in evidence the dagger testified to by Mrs. Reyes Morales, mother of deceased, as being the dagger used by defendant the night her son was killed.

J. F. Rambie testified on direct examination, as follows: "I am a police officer in San Antonio, Bexar County, Texas. I am the one who arrested the defendant, Alejandro Calderon. When I got down to the house, I went inside, there was another fellow holding this fellow. He was lying down on the bed on his back, and another fellow holding both hands, and there was another fellow lying on the foot of the bed, or next to the end of the bed, that was stabbed. I put the handcuffs on this fellow. I put the handcuffs on one hand, and when I went to put it on the other one, there was a knife fell out and fell down behind the bed, and I picked the knife up. I would know the knife if I saw it. (Here witness identified the knife offered in evidence.) I guess that is what you might call a dagger. The blade lacks a little of being six inches long. If it had not been broken it would be six inches long. It is an inch and a quarter wide. It looks like blood on the blade, and there is a little piece broken off the blade. When I got there that night, the blade was broken like that, it looked like a fresh break. I have been a city policeman ever since a year last June. I have had considerable experience, as an officer, with reference to knife wounds. I would call that dagger a deadly weapon; it is a deadly weapon. After I arrested the defendant, I took him to the station, and then I brought him to the city hall. We walked to the station. I guess it was about three-fourths of an hour from the time I arrested this defendant until I got him to the station, maybe a little longer. He seemed sober, he wasn't what I call a drunk man.

"I looked at the deceased, D. Morales; I did not notice anything in his hands. I did not see any weapon or knife lying around there, I went and looked for one, but I couldn't find any. The weapon that dropped out of the hands of the defendant was the only weapon I

· found. At the time I reached there, the deceased, D. Morales, was living. I examined the wounds and saw only one; it was on this side (indicating the right side). I didn't examine him good. The body was bloody. I couldn't tell whether Mrs. Reyes Morales had any blood on her or not, I didn't notice her much. This fellow's cousin was holding the defendant, I don't know what his name is." Cross-examination: "They told me it was the defendant's cousin that was holding him. He was a grown man. There were several people there when I got there, I don't know who they were, but there were several women in the house and several outside. I got the word from a boy who came to the station and told me.

"I would call the defendant sober—to the best of my knowledge, I would say he was sober—he wasn't drunk, I state that positively. He did not stagger in any way. I do not know exactly how long it was after the fight took place that I came upon the scene, but it wasn't very long, it couldn't have been more than twenty or thirty minutes; of course, I don't know exactly. When I got into the house, this man's cousin was holding him. When I got to him there was no one holding him. There was no other officer there when I arrested him. I did not take this knife from under the bed, for when I went to put the handcuffs on, it fell down beside the bed, and I picked it up just as I got the handcuffs on him. Nobody but myself picked the knife up. The mother was not holding him when I got there. The deceased died while I was at the station, after I went to the station. I made a thorough search for a weapon. I went back the second time to look, and I looked good. When I went down, there was a candle, I believe, burning on a trunk, or table, I am not sure—it was dark, I couldn't see very much, I had to have them carry the light back so I could see him good. I don't know exactly what time it was when I got there, but something like one o'clock, I believe, in the morning."

The above was all the testimony introduced by the State on the trial of the case.

The defendant introduced but one witness besides himself. The other witness was his sister, Felipa Calderon, who testified on direct examination, as follows: "The defendant is my brother. I know that my brother killed D. Morales. I was in the kitchen that night, in the house where the deceased lived. I live in the house there. My brother, Alejandro Calderon, the defendant, lived in a little hut in the back part of the lot. I saw my brother and the deceased on that night, because they both were there in the house. I don't know whether the defendant was drinking that night or not. The deceased was not drinking upon that night. At the time this killing took place, I was sitting up in the kitchen. My brother and the deceased had been out two times that evening, but I don't know what time it was when they went out either time. The first time they went out, they came back right away; the second time they went out they were not gone very

long. That was the first time they had been out together. I do not know what time of night it was that this cutting took place."

The appellant, himself, testified on direct examination, as follows: "The deceased and I were together on July 10th. We first got together on that day about half past six in the afternoon, at the house. We went out together afterwards, twice. We stayed out about half an hour each time. We went to the saloon each time. We drank beer in the saloon. We were friends. At that time, I was living in a house adjoining the house of the old lady at the time. I had known the deceased about four months, and I had been living in the yard with the deceased's mother about a month. On that day, I was working. I worked on the section and I quit work at six o'clock. When I quit work, I came home, then I went to the saloon and drank fifty cents worth of beer, all alone. I finished drinking this fifty cents worth of beer about half past six o'clock; then I came home and asked Mr. Morales to go out with me; I went home and got a dollar and Morales and I drank up a dollar in beer. When the money gave out, we went back home and got some more, and he got money too. I got about fifteen cents. We went to the saloon again and Morales bought the beer. I don't know how many beers we drank the second time, I was getting very drunk; then we came back with a bottle of beer. We had four bottles of beer. When we got in front of the house the deceased asked me if I had anything to open the bottle with and I told him no. He took out a knife and broke the head of the bottle off. The knife was about that long (measuring with hands about fourteen inches). Then the deceased went to his house and I went to mine. Then I went and got sixty cents to go to the picture show, then I came back to the deceased's house, then I spoke to him, I hollered to him, 'Come on, let's go to the picture show;' then he caught me around the waist and threw me on the bed and commenced choking me and beat me around the head, and then from there on I don't know nothing. The mother of deceased was there. The old lady fell across my leg and the young man fell across my body and had me around the throat. Then I don't know what I done. The deceased was just as drunk as I was. We were friends up to the time of the fight. I went in to go with the deceased to the moving picture show. I do not know whether I had a knife or not.

Cross-examination: "I also drank whisky that night. I did not drink any up till six o'clock, up till the time I came home from work. I don't know what time this cutting occurred. I do not know whether I had a knife or not, but this is my knife. I do not know whether I got the knife out of that little house back there just before the cutting or not. I do not know whether I had it on me down at the saloon; I don't remember when I got it.

"I remember everything up to where I was knocked down on the bed. My head was kind of funny, I was all out of it. I do not know how long I had owned that knife. I found it, but I don't know what

time it was, I can't calculate the time; it was about three months, and I kept this knife in the house. I don't remember going back that night after I had invited Morales to go to the moving pictures twice, but I remember this man knocking me down, and somebody beat me there in the room, either him or his mother, I don't remember which. I don't remember using the knife. The knife had the point broken off when I found it. I saw my sister that day and talked to her. That was my sister that was on the stand awhile ago. I did not get any money from her that night, I remember that. I remember going into Morales' room and asking him to go to the picture show, and when I went into the house, he caught me, and that Morales' mother and nephew were there; I remember everything up to the time this man caught hold of me, then I don't remember anything after that. I don't know what Morales grabbed me and jumped on me for, but I do remember that he attacked me."

We have copied in full, all the evidence just as it is in the record in this court.

As stated above, no complaint whatever is made by the appellant to the charge of the court. We have considered it fully and carefully, and in our opinion, it is substantially correct in every particular, and presents everything that could be claimed by the appellant as raised by any of the testimony and as favorably to him as it could legally be. In this charge, the court has given the style and number of the cause, the court and the term and addressing it to the jury, tells them what the appellant is charged with and that he has plead not guilty. We then copy the charge in full: "1. Every person with sound memory and discretion, who shall unlawfully kill any reasonable creature in being, within the State, with malice aforethought, either express or implied, shall be deemed guilty of murder. 2. Murder is distinguishable from every other species of homicide, by the absence of circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide. 3. Malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed, or words spoken. 4. Malice, which is absolutely essential to constitute the offense of murder, is either express or implied. 5. All murder committed with express malice is murder in the first degree. 6. Express malice, which is absolutely essential to constitute murder in the first degree, is where one with the sedate, deliberate mind and formed design, unlawfully kills another. 7. When an unlawful killing is established, the condition of mind of the party killing, at the time, just before and just after the killing, is an important consideration in determining the grade of the homicide: and in determining whether murder has been committed with express malice or not, the important questions for a jury to consider are: Do the facts and circumstances in the case, at the time of the killing, and before and after that time, having connection with or relation to it,

furnish satisfactory evidence of a sedate and deliberate mind, on the part of the person killing, at the time he does the act? And do these facts and circumstances show a formed design to take the life of the person slain, or to inflict on him some serious bodily harm, which, in its necessary and probable consequences, may result in his death? Or do the facts and circumstances in the case show such a general reckless disregard of human life as necessarily includes the formed design against the life of the person slain? If they do, the killing, if it amounts to murder, will be upon express malice. 8. In order to warrant a verdict of murder in the first degree, malice must be shown by the evidence to have existed—that is, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the killing was a consummation of a previously formed design to take the life of the person killed, and that the design to kill was formed deliberately, with a sedate mind, that is, at the time when the mind of the person killing, was self-possessed and capable of contemplating the consequences of the act proposed to be done. There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing. A single moment of time may be sufficient. All that is required is that the mind be cool and deliberate in forming its purpose, and the design to kill is formed. 9. When the evidence satisfies the mind of the jury, beyond a reasonable doubt, that the killing was the result of a previously formed design by the defendant to kill deceased, and that the design was formed when the mind was calm and sedate and capable of contemplating the consequences of the act proposed to be done by him, and such killing is further shown to have been unlawful and done with malice, then the homicide is murder in the first degree, and your verdict should be rendered accordingly. 10. To warrant a conviction of murder in the first degree, the jury must be satisfied by the evidence, beyond a reasonable doubt, that the defendant, before the act, deliberately formed the design with a calm and sedate mind to kill deceased; that he selected and used the weapon or instrument reasonably sufficient to accomplish the death by the mode and manner of its use. The act must not result from a mere sudden, rash and immediate design, springing from an inconsiderate impulse, passion or excitement, however unjustifiable and unwarrantable it may be. 11. Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, Alejandro Calderon, did, in the county of Bexar, and State of Texas, on the 10th day of July, A. D., 1910, as charged in the indictment, with express malice aforethought, with a knife, being a deadly weapon, or instrument well calculated and likely to produce death, by the manner in which it was used, with a sedate and deliberate mind and formed design to kill, unlawfully cut with a knife and thereby kill said D. Morales, you will find him guilty of murder in the first degree and so state in your verdict, affixing the penalty therefor. 12. The punishment for murder in the first degree shall be by death or by confinement in the State

penitentiary for life, as the jury may determine and state in their verdict.

"The next lower grade of culpable homicide than murder in the first degree is murder of the second degree. Malice is also a necessary ingredient of the offense of murder in the second degree, the distinguishing feature, however, so far as the element of malice is concerned, is: that in murder in the first degree, malice must be proved to the satisfaction of the jury, beyond a reasonable, doubt, as an existing fact, while in murder in the second degree, malice will be implied from the fact of an unlawful killing.

"Implied malice is that which the law infers from or imputes to certain acts, however suddenly done; thus, when the fact of an unlawful killing is established, and the facts do not establish express malice, beyond a reasonable doubt, nor tend to mitigate, excuse or justify the act, then the law implies malice, and the murder is in the second degree; and the law does not further define murder in the second degree, that if the killing is shown to be unlawful, and there is nothing in evidence on the one hand showing express malice, and on the other hand, there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice, and the homicide is murder in the second degree.

"The instrument or means by which a homicide is committed are to be taken into consideration in judging the intent of the party offending. If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless from the manner in which it was used, such intention evidently appears.

"Every person is permitted by law to defend himself against any unlawful attack, reasonably threatening injury to his person, and is justified in using all the necessary and reasonable force to defend himself, but no more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against any unlawful and violent attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury.

"If you believe from the evidence, beyond a reasonable doubt, that. the defendant, with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, did unlawfully cut the deceased with implied malice aforethought, as heretofore defined, and in doing so, he did not act under the immediate influence of sudden anger, rage, resentment, or terror arising from an adequate cause, that is, such cause as would commonly produce such passion in a degree that would, in a person of ordinary temper, render the mind incapable of cool reflection, and not in defense of himself against an unlawful attack, reasonably producing a rational fear or expectation of death or serious bodily injury, with the intent to kill, did cut with a knife and thereby kill D. Morales as charged in the indictment, you will find him guilty of murder, in the second degree,

and assess his punishment at confinement in the State penitentiary for any period that the jury may determine and state in their verdict, provided it be for not less than five years.

"Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by law.

"By the expression, 'under the immediate influence of sudden passion,' is meant: 1. The provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation. 2. The act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by the passion arising from some other provocation, or a provocation given by some other person than the party killed. 3. The passion intended is either of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection. 4. By the expression, 'adequate cause,' is meant, such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the state of mind referred to, that is, of anger, rage, sudden resentment or terror, sufficient to render it incapable of cool reflection, but also that such state of mind did actually exist at the time of the commission of the offense.

"Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation (if any), to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection and that said facts and circumstances were sufficient to produce such state of mind, in person of ordinary temper, then the proof as to sufficiency of the provocation satisfies the requirements of the law, and so in this case, you will consider all the facts and circumstances in evidence determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause (if any) producing such condition.

"If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon, or instrument reasonably calculated and likely to produce death, by the mode and manner of its use, acting under the immediate influence of sudden anger, rage, resentment, or terror arising from an adequate cause, that is, such cause as would commonly produce such passion in a degree that would, in person of ordinary temper, render the mind incapable of cool reflection, and not in defense of himself against an unlawful attack. reasonably producing a rational fear or expectation of death or serious bodily injury, did cut with a knife and thereby killed D. Morales, the

deceased, as charged in the indictment, you will find the defendant guilty of manslaughter, and assess his punishment at confinement in the State penitentiary for any term of not less than two nor more than five years.

"Should you find the defendant guilty of murder in the first degree, guilty of murder in the second degree, or guilty of manslaughter, you will state of which offense found guilty; and, if of murder, you will state of which degree of murder, and for whatever offense you may find him guilty, you will affix the punishment for that crime as above directed.

"If from the evidence, you are satisfied, beyond a reasonable doubt, that the defendant is guilty of murder, but have a reasonable doubt whether it was committed upon express or implied malice, then you must give the defendant the benefit of such doubt, and not find him guilty of a higher grade than murder in the second degree. Or, if from the evidence, you believe, beyond a reasonable doubt, that the defendant is guilty of some grade of culpable homicide, but you have a reasonable doubt whether the offense is murder of the second degree or manslaughter, then you must give the defendant the benefit of the doubt, and in such case, if you find him guilty, it could not be of a higher grade of offense than manslaughter.

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If from the evidence, you believe the defendant killed the said D. Morales, but further believe that at the time of so doing, the deceased had made an attack on him which, from the manner and character of it, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him; and if the deceased was armed at the time he was killed and was making such attack on defendant, and if the weapon used by him and the manner of its use were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict serious bodily injury upon the defendant.

"In this case, evidence has been introduced in behalf of the defendant, to show that at the time of the commission of the offense (if any), he was in a state of drunkenness, or intoxication by the recent use of ardent spirits, and as to this phase of the case, you are instructed:

"That neither intoxication nor temporary insanity of mind, produced by the voluntary recent use of ardent spirits, constitutes in this

State, any excuse for the commission of crime, nor does intoxication mitigate either the degree or penalty of crime, but evidence of temporary insanity, produced by such recent use of ardent spirits, should be considered in mitigation of the penalty attached to the offense for which the defendant is on trial, and in cases of murder, for the purpose of determining the degree of murder of which the defendant may be found guilty.

"However, to be considered at all, the use of ardent spirits must have been indulged to the extent of producing temporary insanity, which is that degree of insanity that deprives the person of the capacity and power to distinguish between right and wrong as to the particular act charged against him. In other words, 'temporary insanity,' caused by drunkenness, is that condition of the mind directly produced by the use of ardent spirits, and where the state of intoxication reaches such a degree that the person becomes incapable of knowing that the act he is doing is wrong and criminal. Where such is the case, he is in a condition of temporary insanity within the meaning of our statutes.

"Now, if you believe from the evidence in this case, that the defendant, at the time of the commission of the offense for which he is on trial (if you find him guilty of such offense), was laboring under temporary insanity as above defined, produced by the voluntary recent use of ardent spirits, you will take such temporary insanity into consideration in mitigation of the penalty attached to the offense for which defendant is on trial, and arriving at the degree of the offense, if any, of which, from the evidence, if any, you may find the defendant guilty, should you find him guilty.

"The defendant, in a criminal case, is presumed to be innocent until his guilt is established by legal evidence, beyond a reasonable doubt; and in case you have a reasonable doubt as to the defendant's guilt, you will acquit him and say by your verdict, 'Not Guilty.'

"You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the testimony, but you are bound to receive the law from the court, which is herein given you, and be governed thereby."

The law—whether wisely or not, it is needless for us to say—has left exclusively to the jury the weight to be given to the testimony and the credibility of the witnesses. They see and hear the witnesses and are better competent to judge of these matters than this court, when what is testified before them is only written down by the court stenographer. They are all disinterested, unbiased and unprejudiced. Besides this, the trial judge, who is also unbiased and unprejudiced, wholly disinterested, hears and sees the same thing. He is much better qualified to judge of the weight to be given to the evidence and the credibility of the witnesses than this court can be. This court, under the circumstances, simply has the power and authority to determine whether there was sufficient evidence to justify and authorize the verdict of the jury and the action of the lower court. We are not un-

mindful of the gravity of the task before us when the death penalty has been inflicted and we always undertake to scrutinize the record with a great deal of care to see that the defendant has had a fair and impartial trial and that the evidence justifies the verdict and that there are no reversible errors committed in the charge, the introduction or exclusion of testimony, properly complained of.

In this case, we have reached the conclusion that the evidence fully justifies the verdict of murder in the first degree, and that it clearly justified the jury to find that the killing was with express malice. The question of what penalty shall be inflicted, whether that of death or life sentence, is peculiarly the province of the jury under the guidance of the lower court.

We are thoroughly satisfied that we would not be justified in reversing and remanding this cause and that the verdict of the jury is fully supported by and is in accordance with the evidence. The case will therefore be affirmed.

*Affirmed.*

DAVIDSON, Presiding Judge, (dissenting).—My brethren have set out pretty fully the facts in the majority opinion, holding them sufficient to justify the verdict of the jury assessing the death penalty. I have given the matter very serious consideration, and while I would be cautious in dissenting on a question of fact ascertained by the jury, yet I do not believe the evidence in this case is sufficient to justify the death penalty, which is predicated in this case alone upon express malice. If there be not express malice shown so as to justify the infliction of the death penalty, the judgment ought to be reversed. Had the jury assessed a verdict of murder in the second degree, with a severe penalty, I would not have dissented. There is too much uncertainty about the facts, as shown by the record, in my judgment, to justify the infliction of death. There is not sufficient evidence, as I read the statement of facts, to show express malice. The evidence for the State is full of contradictions on the most material facts. The old mother contradicts herself about every material question almost upon which she does testify, not only as to the details of the homicide, but all the occurrences of the night upon which the homicide is said to have been committed. Her testimony is out of harmony with that of her grandson, Agular. The officers contradict these witnesses about the condition of things when they reached the room where the parties were, and the killing occurred. The fact, if it be true, that the old mother of the deceased and the grandmother of Agular, was able to hold appellant down on the bed and he on top of her, and prevent his use of the knife for twenty-five or thirty minutes, would be evidence of the fact that the man was in an inebriated condition, as he claimed, and this, taken in connection with the fact that the deceased and defendant had been friends to the time of the difficulty, and had been drinking together that night, appellant was drunk, would show

a want of express malice. The facts show, from the State's standpoint, a sudden quarrel and consequent killing. This is much enhanced by defense evidence. No previous ill-will, animosity, or trouble is shown to have ever existed before this night, and they had been friendly and drinking together that night. The evidence is confusing as to the condition of things, and contradictory on almost every question or point raised, especially the evidence of the mother of deceased. The evidence of the officers, to some extent, breaks the force of the evidence of some of the witnesses that he was drunk; they said they thought he was simulating, but the facts, the amount of the intoxicants that had been taken, are in the case as a part of it and must remain, so far as the record is concerned. These officers thought he was simulating. That was only a conclusion on their part. While drunkenness is not an excuse for crime under our statute, at least the peculiar character of drunkenness shown here, still, it is a matter our statute has humanely provided may be taken into consideration in ascertaining the degree of homicide and in mitigation of the penalty attached to the degree found. Taking the testimony in its entirety and all the circumstances and the manner of the witnesses testifying in connection with the immediate facts, as shown by the testimony of all the witnesses in regard to the condition of the room where the parties were and where the homicide occurred, in my judgment, they are not sufficiently cogent to justify the hanging of this Mexican. I am unwilling to sanction the punishment under the state of case made by the record.

For the above reasons I most respectfully enter my dissent. I believe the case ought to be reversed and the cause remanded for another trial.